B A PROPERTIES, INC., Plaintiff,

v.

AETNA CASUALTY & SURETY CO., United States Fire Insurance Co., and Zurich Insurance Company, Defendants.

No. CIV.1997–006.

District Court, Virgin Islands, D. St. Thomas.

April 24, 2002.

Richard R. Knoepfel, St. Thomas, VI, for the plaintiff.

R. Eric Moore, St. Thomas, VI, for the defendants.

## MEMORANDUM

MOORE, District Judge.

## I. FACTUAL BACKGROUND

B A Properties, Inc. ["plaintiff" or "the insured"] is a Delaware corporation with its principal place of business in California. It is a subsidiary of Bank of America Corporation and an affiliate of Bank of America National Trust & Savings Association. (Compl.¶ 3.) Bank of America Corporation and Bank of America National Trust & Savings Association loan money for all kinds of projects and take back mortgages on property as security. When, on occasion, a loan goes into default and the mortgage is foreclosed, B A Properties may acquire the mortgaged property at a foreclosure or judicial sale. (Declaration of Eric B. Forsberg Filed in Support of B A Properties' Mot. for Summ. J. and B A Properties Opp'n to Defendants' Mot. for Partial Summ. J. ["Forsberg Decl."] ¶ 2.) It hopes to own such property for a relatively short period, while it markets, locates buyers for, and negotiates the sale of the properties to recoup as much of the defaulted loan as possible. B A Properties does not actually operate these properties, but instead contracts out the day-to-day operations, remaining responsible for each property until it can arrange a sale to a third party. (Id.) This is how B A Properties came to own the property which is the subject of this insurance dispute.

In July, 1994, Bank of America Corporation and/or Bank of America National Trust & Savings Association foreclosed its mortgage on a hotel property then known as the Grand Palazzo Hotel [1] ["Hotel"] located on Great Bay, St. Thomas, U.S. Virgin Islands and owned by Pemberton Resorts, Inc. B A Properties acquired the Hotel at judicial sale. (Id. ¶ 3.) B A Properties then took possession of the "fifteen-acre, beachfront, five-star, luxury resort hotel complex with 152 ocean view suites and deluxe rooms, dining facilities, swimming pool, tennis courts, and other related recreational facilities." (Id. ¶ 4.)

On or about March 31, 1995, each of the defendants, Aetna Casualty & Surety Company, United States Fire Insurance Company, and Zurich Insurance Company ["defendants" or collectively "Aetna" or "the insurers"] issued a written contract of insurance to Bank of America Corporation, Bank of America National Trust & Savings Association, and "all associated, affiliated and/or subsidiary companies or corporations, firms, individuals, Partnerships, Joint Ventures or legal representatives Or Any Nominee Thereof for Account of and at the Option of the Named Insured after a loss as are now, or as may hereafter be constituted." [2] These policies were issued jointly as part of a "Master Property and Special Coverage" ["Master Property Policy" or "the policy"] to Bank of America Corporation, Bank of America National Trust & Savings Association, and all related entities, including B A Properties as a subsidiary of Bank of America Corporation.

---

1. The hotel, rebuilt in 1996 following Hurricane Marilyn, now is known as the Ritz-Carlton and is owned by the Marriott Corporation.

2. The Aetna Policy is No. 05 FSK 109901 SCA (attached as Ex. A to Forsberg Decl.) ["Aetna Policy"]; the United States Fire Insurance Company Policy is No. 245–000001 (attached as Ex. B to Forsberg Decl.) ["U.S. Fire Ins. Policy"]; and the Zurich Insurance Company Policy is No. MLP U053637 (attached as Ex. C to Forsberg Decl.) ["Zurich Ins. Policy"]. Each of the policies is identical, except for the parties' names and the amounts of insurance coverage provided. For ease of reference, the Court will cite only to the Aetna Policy, although the same language can be found in both the U.S. Fire Policy and the Zurich Policy.

The Master Property Policy was for a one-year term, expiring on March 31, 1996. The policy provided up to $45 million in coverage for damages or losses sustained by the insured as a result of damage or loss to real or personal property in which the insured has an interest, subject to a basic policy deductible of $500,000, and a deductible of $1,000,000 for windstorm losses in the U.S. Virgin Islands. (Compl.¶ 12.) The policy provided coverage for damage resulting from a hurricane, i.e., damage resulting from rain, flood, waves, etc. (*Id.* ¶ 13.) It also provided coverage for losses stemming from business interruption caused by any covered event such as a hurricane.[3] On September 15, 1995, Hurricane Marilyn struck St. Thomas, causing severe damage to the Hotel, including extensive damage to the roof, the landscaping, and the Hotel buildings. The damage was so severe that B A Properties completely shut down the Hotel following the hurricane.

In March, 1996, plaintiff filed a claim against the Master Policy for $31,598,363.76 in covered losses. On or about June 13, 1996, B A Properties sold the Hotel to Marriott Corporation, without retaining any interest in the property. (*See* Ex. D Forsberg Decl.) In August, 1996, the insurers notified plaintiff that it was willing to pay $16,880,635 on the claim, subject to the $1 million deductible for windstorm losses in the U.S. Virgin Islands. (Compl.¶¶ 20–21.) The insurers rejected B A Properties' claims for damage to planters, balconies, and patios; certain code upgrades; and overhead and fees. (*Id.* ¶ 21.) They specifically refused to pay for any losses resulting from business interruption after June 13, 1996, when plaintiff sold the Hotel. B A Properties, in an effort to settle the claim, submitted a revised claim totaling only $24,153,132, but the insurers refused to alter their original settlement offer.

B A Properties filed this suit seeking recovery for the damages caused by the insurers' alleged breach of contract and breach of the implied covenant of good faith and fair dealing, and for declaratory relief. (Compl.¶¶ 24–37.) Pending before me is B A Properties' motion for summary judgment or, alternatively, for a summary adjudication of the issues. Plaintiff argues as a matter of law that it is entitled to business interruption coverage for the entire amount of time it would have taken B A Properties to rebuild the Hotel if it had not sold the Hotel. B A Properties also seeks a ruling, again as a matter of law, that this coverage includes the cost of upgrades to the Hotel needed to bring it into compliance with any new provisions of the Virgin Islands Building Code adopted after the hurricane. The insurers have filed a motion for partial summary judgment, seeking a ruling as a matter of law that B A Properties cannot recover for losses stemming from business interruption for any time after it sold the Hotel in June, 1996.

## II. DISCUSSION

### A. Jurisdiction

The amount in controversy in this matter clearly exceeds the jurisdictional amount exclusive of interest and costs, and diversity of citizenship exists between the plaintiff and the defendants. Accordingly, this Court has diversity jurisdiction under section 22(a) of the Revised Organic Act of 1954[4] and 28 U.S.C. § 1332.

---

**3.** *See* Aetna Policy "Coverage B: Time Element (1)" at PTY 2.

**4.** 48 U.S.C. § 1612(a). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995 & Supp.2001), *reprinted in* V.I. CODE ANN. 73–177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp.2001) (preceding V.I. CODE ANN. tit. 1).

## B. Choice of Law

■ A preliminary issue I must resolve before proceeding to the merits is the choice of law that governs this dispute. B A Properties contends that the law of California should apply to this matter while the insurers argue that Virgin Islands law applies. As the Court is exercising diversity jurisdiction, it must use Virgin Islands' choice of law rules to determine which law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

A Virgin Islands court must look to the common law as expressed in the Restatement (Second) of Conflict of Laws to resolve this question.[5] Section 193 of the Restatement governs contracts of fire, surety, or casualty insurance such as the insurance contract at issue here. Section 193 provides:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in section six [of the Restatement] to the transaction and the parties, in which event the local law of the other state will be applied.

Under this provision, the location of the insured risk is given the greatest weight in determining the correct choice of law to apply. The common sense rationale behind section 193 is explained in comment c:

> A number of reasons serve to explain why such importance is attached to the principal location of the insured risk. This location has an intimate bearing upon the risk's nature and extent and is a factor upon which the terms and conditions of the policy will frequently depend.... For these and other reasons, the location of the risk is a matter of intense concern to the parties to the insurance contract.... Likewise, the state where the insured risk will be principally located during the term of the policy has a natural interest in the determination of issues arising under the insurance contract.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 cmt. c ["RESTATEMENT"]. The insured argues that the insured risks are located in more than one location so section 193 does not apply, relying heavily on a decision of the United States Court of Appeals for the Third Circuit. *See Compagnie des Bauxites de Guinee v. Argonaut–Midwest Ins. Co.*, 880 F.2d 685 (3d Cir.1989). B A Properties, however, misconstrues the holding of the *Compagnie* decision.

The dispute in *Compagnie* involved a design defect in a piece of equipment manufactured in Iowa. The equipment later failed at the plaintiff's facility in the Republic of Guinea in West Africa. *See id.* at 690. The Court of Appeals held that section 193 is "limited to cases in which there is an understanding among the parties as to the location of the insured risk," which did not apply to this moveable piece of equipment whose location the parties had not agreed upon. *See id.* Since section 193 did not cover the moveable insured risk, the *Compagnie* court applied section 188 of the Restatement and a balancing test of various factors as is required under governing Pennsylvania law.[6]

---

5. In the absence of such local law to the contrary, the rules of common law as expressed in the American Law Institute's restatements of law shall be the rules of decision in courts of the Virgin Islands. *See* 1 V.I.C. § 4.

6. I note that none of the cases cited by B A Properties in support of its argument concerning the correct rule of decision apply Virgin Islands law.

In this case, it is evident from the terms of the Master Policy that the parties understood the importance of the location of each insured risk and had agreed that the location of an insured property determines whether a special term covered that particular risk. For example, the parties incorporated special provisions governing losses resulting from earthquakes in the state of Washington, wind damage to properties in coastal regions of Texas, Maryland, and Hawaii, and wind damage to properties in the U.S. Virgin Islands. (*See* Aetna Policy "Coverage F" at PTY 8.) Furthermore, unlike the facts in *Compagnie,* the insured risk in this instance was real property, the Hotel, for which the risk of loss never moved. Finally, Virgin Islands insurance law also favors the application of Virgin Islands law to this dispute. *See* 22 V.I.C. § 820 (prohibiting contract of insurance "delivered or issued for delivery in the Virgin Islands and ... to be performed in the Virgin Islands" from containing "any agreement or condition that requires it to be construed according to the laws of another jurisdiction.").

The parties in this instance understood that the insured risk at issue was located in the Virgin Islands when they entered into the Master Policy agreement. This coupled with the fact that Virgin Islands law favors the application of Virgin Islands law to insurance disputes involving an insured risk located within the Territory convinces this Court that the law of the Virgin Islands is the appropriate rule of decision in this matter.[7]

**C. Business Interruption Coverage**

B A Properties has moved for summary judgment and the insurers have moved for partial summary judgment on the issue of the extent of the business interruption coverage provided by the Master Policy. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under Virgin Islands law, "the interpretation, construction and legal effect of an insurance policy is a question to be determined by the court as a matter of law." *Coakley Bay Condo. Ass'n v. Continental Ins. Co.,* 26 V.I. 348, 354, 770 F.Supp. 1046, 1050 (1991) (citing *Berne v. Aetna Ins. Co.,* 604 F.Supp. 958 (D.Vi.), *aff'd,* 782 F.2d 1026 (3d Cir.1985)). The Court should look only to the plain language of the contract between the parties and avoid ambiguities when interpreting the contract. *Berne,* 604 F.Supp. at 960. If the contract language is ambiguous, the Court must construe any ambiguity against the insurer and in a manner which is favorable to the insured. *See Buntin v. Continental Ins. Co.,* 583 F.2d 1201, 1207 (3d Cir.1978).

The Master Policy entered into between B A Properties and the insurers provides the following:

> **Business Interruption:** This policy shall cover against the loss sustained by the Insured anywhere in the world, as a result of loss or damage to property in the United States (including its territories), Canada and Puerto Rico, resulting from necessary interruption of business conducted by the insured and caused by loss, damage, or destruction by any of the perils covered herein during the term of this policy to all real or personal

---

**7.** B A Properties' decision to file suit in the Virgin Islands rather than in California confirms this understanding.

property as described in Coverage A, on PTY1. If such loss occurs during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Insured, including ordinary payroll, consisting of the net profit which is thereby prevented from being earned, fees, penalties, and all charges and other expenses only to the extent that they continue during the interruption of business, and only to the extent to which they would have been earned had no loss occurred.

(Aetna Policy "Coverage B: Time Element (1)" at PTY 2.)

Plaintiff maintains that the amount of business interruption coverage owed by the insurers to the insured under this policy can be determined on the date of the loss and that the subsequent sale of the insured risk, the Hotel, had no effect on this determination. In support of this argument, B A Properties points to another provision of the policy which provides:

(1) Determining Loss:

The length of time of suspension of business for which loss may be claimed:

(a) shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been destroyed or damaged including any additional time required to comply with laws and ordinances.

(Aetna Policy "Special Conditions Applying to Time Element Losses" at PTY 4.) The policy does not require that the insured actually rebuild or replace the property that has been destroyed or damaged. The insurers disagree with B A Properties' interpretation of these provisions, arguing instead that the business interruption coverage terminated when the insured sold the property to a third party and thus relinquished any insurable interest it had in the property.

Under Virgin Islands law, "[n]o contract of insurance on property or of any interest therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the things insured." 22 V.I.C. § 804(a). An "insurable interest" is defined as "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." *Id.* § 804(b). The insurable interest that B A Properties had in the Hotel ceased to exist on June 13, 1996, when it transferred title to the property to a third party and did not retain any rights to that property. (*See* Forsberg Decl. Ex. D ("Agreement of Purchase and Sale and Joint Escrow Instructions By and Between B A Properties, Inc. and Grand Palazzo (Virgin Islands), Inc.").) The question, however, is whether this transfer also terminated the business interruption coverage or whether B A Properties is entitled to business interruption coverage regardless of the sale of the property.

The plain language of the business interruption coverage provision in the policy provides the answer. The policy provides coverage only for the actual losses sustained by the insured while the Hotel's business was interrupted due to the hurricane: "If [a business interruption] loss occurs during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED ... *only to the extent that [the losses] continue during the interruption of business* ...." (Aetna Policy "Coverage B: Time Element (1)" at PTY 2) (emphasis added). *See, e.g., Ebert v. Grain Dealers Mut. Ins. Co.*, 158 Ind.App. 379, 303 N.E.2d 693, 697 (1973) (Business interruption insurance coverage provides for what the "business itself would have [earned] had no interruption occurred."). The policy specifically contemplates that things may happen during the reasonably predictable period of business interruption

that will affect the calculation of the loss the insured actually sustained. The amount of the actual loss sustained thus was not fixed at the time of the hurricane; it was subject to adjustment during the reasonably projected period that the Hotel would be out of business due to the storm damage. In this case, one of those things that affected the loss calculation was the insured's sale of the Hotel. Once B A Properties sold the property, its loss of business income was no longer due to the hurricane's interruption, but, rather, due to its lack of an insurable interest in the Hotel.

Accordingly, I find that B A Properties' sale of the Hotel to a third party reduced to zero the amount of continuing business losses it experienced as a result of the hurricane. From the date of the loss in September, 1995, until the date of the sale of the property in June, 1996, B A Properties had an insurable interest in the property and a corresponding right to a stream of income from that property as recognized by the business interruption coverage provided in the Master Policy. Following the sale of the property, B A Properties no longer had any recognizable right to a stream of income from the Hotel and could no longer show the actual losses sustained required under the business interruption coverage of the Master Policy.[8]

The plain language of the Master Policy between B A Properties and the insurers required that B A Properties retain an insurable interest in the stream of income from the insured property in order to collect under the business interruption coverage provisions of the policy. As B A Properties' sale of the property terminated its right to this stream of income and its insurable interest in the Hotel, it was not entitled to business interruption coverage after the date of the sale. Accordingly, I will deny the plaintiff's motion for summary judgment and grant the defendants' motion for partial summary judgment on this issue.

### D. Coverage for Code Compliance

■ Both parties agree, and the plain language of the Master Policy confirms, that B A Properties is entitled to payment for the cost of rebuilding the Hotel after Marilyn, even though it did not rebuild the insured property. B A Properties maintains that it is entitled to factor in any cost of complying with upgrades in the Virgin Islands Building Code, including those provisions enacted in the months immediately following Hurricane Marilyn in 1995. The insurers argue that B A Properties is only due "reimbursement" for the cost of complying with the code as it existed at the time of the loss and not as it may have been modified after the loss.

The applicable provision of the Master Policy is as follows:

In case of loss, the basis of adjustment shall be as follows:

---

**8.** All the decisions plaintiff cites in support are distinguished by the fact that the insured in those cases still had an insurable interest in the property. For example, it cites to numerous cases where the insured continued to own the property but decided not to rebuild and received business interruption coverage for the projected period it would have taken to rebuild. *See, e.g., Beautytuft, Inc. v. Factory Ins. Ass'n,* 431 F.2d 1122 (6th Cir.1970); *First Inv. Co. v. Vulcan Underwriters of N. British & Mercantile Ins. Co.,* 33 F.2d 785 (D.Or.1927);

*Grand Pac. Hotel Co. v. Michigan Commercial Ins. Co.,* 243 Ill. 110, 90 N.E. 244 (1909); *Anchor Toy Corp. v. American Eagle Fire Ins. Co.,* 4 Misc.2d 364, 155 N.Y.S.2d 600 (N.Y.Sup.Ct.1956); *see also DiLeo v. United States Fidelity & Guar. Co.,* 109 Ill.App.2d 28, 248 N.E.2d 669, 674–75 (1969) (holding that insured retained insurable interest in lease even though it expired days after it sustained loss since ejectment proceedings would take months). B A Properties' sale of the property made all those cases inapposite.

A. Buildings, structures, improvements, and betterments owned by the Insured at replacement cost new (plus custom duties, taxes, or assessments if incurred) without deduction for depreciation at time and place of loss, which in no event will exceed the cost for rebuilding, repairing or replacing on the original site *whether or not building is actually rebuilt or replaced including the increased cost occasioned by the enforcement of any ordinance,* and including the value of the undamaged part of facility.

(Aetna Policy "Valuation" at PTY 11–12 (emphasis added).)

The plain language of the policy provision stated above mandates coverage for costs resulting from code upgrades that are enforced against a property under construction following an insured loss. This language does not distinguish between increase building costs due to enforcement of a pre-existing or a newly enacted ordinance. Thus, if during the course of rebuilding an insured property following a covered loss, such as occurred here, the Legislature modifies the Virgin Islands Building Code by imposing higher standards that are immediately enforceable against properties still under construction, the insured is entitled to any increased cost occasioned by enforcing the upgraded code provisions. This is what is meant by the policy term, "at replacement cost new." [9]

Accordingly, I will grant B A Properties' motion for summary judgment on the scope of coverage of this provision of the Master Policy. Whether and the extent of any "increased costs occasioned by the enforcement of any ordinance" are facts which remain to be determined.

## III. CONCLUSION

B A Properties retained no insurable interest in the Hotel, or in any income stream it might have produced if not damaged by the hurricane, upon its sale of the property to a third party in June of 1996. Accordingly, plaintiff is not entitled to coverage for losses resulting from business interruption following the date of the sale. The Court will deny B A Properties' motion for summary judgment on this issue and will grant the insurers' motion for partial summary judgment.

The plain language of the Master Policy provides full replacement cost of an insured property following a loss. This must include any new code provisions adopted while the property is under reconstruction that are enforced against the property. If B A Properties at trial can establish the necessary facts to support such a claim, it is entitled to such coverage under the Master Policy. Accordingly, the Court will grant B A Properties' motion for summary judgment on this issue.

An appropriate order is attached.

### ORDER

For the reasons set forth in the accompanying memorandum opinion of even date, it is hereby

**ORDERED** that the plaintiff's motion for summary judgment (Docket # 148) is **GRANTED IN PART** and **DENIED IN PART**. It is further

**ORDERED** that the defendants' motion for partial summary judgment (Docket # 139) is **GRANTED**.

9. Whether the policy would cover any costs resulting from retroactive application of building code upgrades to insured property after it has been reconstructed is not before the Court.